UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TARA B. LEY,

                          Plaintiff,

v.

STATE OF NEW YORK, DEPARTMENT
OF CORRECTIONS AND COMMUNITY
SUPERVISION,

                          Defendant.

_____

**REPORT AND
RECOMMENDATION**

17-CV-00918(JLS)(JJM)

          Plaintiff Tara B. Ley commenced this action against the defendant State of New

York, Department of Corrections and Community Supervision ("DOCCS") alleging violations of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.* ("Title VII").  Before the

court is DOCCS' motion for summary judgment [21], which has been referred to me for initial

consideration [5].[1]  Having reviewed the parties' submissions [21, 27, 30], I recommend that the

motion be granted.

## BACKGROUND

          Plaintiff is a Caucasian female with a long history of employment of DOCCS as a

dental hygienist at the Lakeview Shock Correctional Facility.  Plaintiff's Statement pursuant to

Fed. R. Civ. P. ("Rule") 56 [27-2], ¶¶1, 5, 9.  Margaret Borrello, the dental assistant at Lakeview,

is also a Caucasian female and a long-time employee of DOCCS. Id. ¶¶16, 17, 20, 21.[2]  Dr.

---

[1]       The case was originally assigned to District Judge Lawrence J. Vilardo, who referred the case to
me to hear and report on dispositive motions [5].  After DOCCS' motion was filed and briefed, the case
was reassigned to District Judge John L. Sinatra, Jr. [31].

[2]       Ms. Borrello, who is represented by the same counsel as plaintiff, filed an action against DOCCS
with very similar allegations (Margaret Borrello v. State of New York, Department of Corrections and
Community Supervision, 17-CV-00919). Although the cases were never formally consolidated, a Report

Surendra Pattathan, a dentist, began working part-time at Lakeview in September 2014, and became full-time in June 2015. Id., ¶24. Dr. Pattathan, who is of Indian national origin, was plaintiff's and Ms. Borrello's direct supervisor. Id., ¶¶25, 27. During the relevant period, there were no other employees in Lakeview's dental clinic. Id., ¶¶26, 156. For a brief period when Dr. Pattathan began working at Lakeview in a part-time capacity, Dr. Thomas Sabuda was the other part-time dentist. Plaintiff's deposition transcript [27-3], pp. 229-30. Plaintiff states that Dr. Ronald Hellert, DOCCS' Regional Dental Director, directed her and Ms. Borrello to "lead Dr. Pattathan to the procedures of the way the program was run, basically train him". Id., p. 61.[3]

Plaintiff alleges that Dr. Pattathan initially subjected her to race and gender discrimination in early 2015, and that it continued until her transfer to the Collins Correctional Facility in February 2016. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶¶44-45. According to plaintiff, every instance of race discrimination that she experienced is set forth in her Complaint, and while she denied that every instance of gender discrimination was similarly alleged in the Complaint, she was unable to identify any specific conduct that was not included, but did state that "[i]t was just a daily pounding of not being able to talk because I am a woman, that I should just be doing what I am told". Id., ¶52, plaintiff's deposition transcript [27-3], p. 59.

### December 2014

Although plaintiff alleges that she did not begin to feel that she was being subjected to race and gender discrimination until early 2015, the first alleged incident occurred on December 5, 2014, when Dr. Pattathan accused plaintiff of yelling at him and interfering with

---

and Recommendation is being simultaneously filed in that case addressing DOCCS' motion for summary judgment.

[3]    The docket entry of plaintiff's exhibits [27-3] includes a litany of exhibits totaling 783 pages. Plaintiff's and Ms. Borrello's deposition transcripts are the second and third exhibits and my page references are to the transcript pagination, rather than the CM/ECF numbering.

his work, after plaintiff corrected Dr. Pattathan in front of an inmate concerning the procedure

for administering antibiotics when a patient refuses treatment. Plaintiff's Statement pursuant to

Rule 56 [27-2], ¶¶54-55. According to plaintiff, Dr. Pattathan "didn't want a woman telling him

how things are done". Plaintiff's deposition transcript [27-3], p. 63.  Thereafter, a meeting was

held with the dental clinic staff, as well as Dr. Hellert and Deputy Superintendent of

Administration ("DSA") Sherry Tarbell, a Caucasian female, to address the issues in the dental

clinic.  Id., ¶56. During that meeting, the dental staff were instructed to listen and learn from

each other. Id.[4]

   Plaintiff believed that since Lakeview required inmates to hold themselves in

"military bearing", it applied when inmates were in the dental chair.  Id., ¶¶37-38.[5]  By

memorandum dated December 30, 2014, plaintiff informed Lieutenant Wronski of an incident

during which she heard an inmate being treated by Dr. Pattathan "humming and singing" for at

least five minutes.  When the inmate was done being treated by Dr. Pattathan, plaintiff asked Dr

Pattathan to watch the inmate so that she could locate a corrections officer concerning the

inmate's behavior, but he ignored her request. [27-3], p. 667 of 783 (CM/ECF).  Plaintiff

---

[4] Dr. Sabuda (the other dentist employed in the clinic when Dr. Pattathan began his employment) also conflicted with Ms. Borrello and plaintiff. In a January 22, 2015 e-mail to DSA Tarbell, he stated that Ms. Borrello and plaintiff "both displayed very inappropriate behavior in front of the inmate patient and their attitude really 'sucks' at times.  They behave like piranhas feeding on the dentist when I 'screw up' (my words) . . . . These two are the biggest complainers I have ever met professionally". [21-4], pp. 23-24 of 817 (CM/ECF). Likewise, in a June 29, 2015 e-mail from Deborah Watkins, the Deputy Superintendent of Programs ("DSP") and the Acting Superintendent of Lakeview, she stated that "[t]here is a long history with the hygienist, and the assistant.  Lakeview has gone through a few dentist [sic], all claiming the same thing.  We have a letter on file from Dr. Sabuda, stating that the hygienist and the assistant were very toxic to him and he resigned". Id., p. 67 of 817.  Plaintiff believed that Dr. Sabuda had difficulty learning policy and procedure. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶250.

[5] Ms. Borrello did not share the same view. She did not expect inmates to following military bearing while in the dental chair. Borrello deposition transcript [27-3], p. 30.

explained that Dr. Pattathan's "lack of communication" had "caused stress and a hostile work environment", because she did "not feel safe" working with him. Id.

### February 2015

Plaintiff alleges that on February 25, 2015, Dr. Pattathan was "nasty" when she attempted to correct him on how to count "sharps" - *i.e.*, needles or syringes. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶60.

### May 2015

Plaintiff's May 21, 2015 annual performance evaluation from Dr. Pattathan rated her overall performance as satisfactory. Id., ¶¶62-63. However, Dr. Pattathan made two negative comments, including that plaintiff should "focus more on the . . . treatment of her own patients and not interfere and dictate treatment when [the] dentist is treating his patients". [21-4], p. 21 of 817 (CM/ECF).

### June 2015

On June 3, 2015, plaintiff informed DSA Tarbell and Dr. Hellert of certain alleged professional misconduct by Dr. Pattathan - *e.g.*, amending patient charts and leaving medication and forceps on his desk. Id., ¶¶65, 68. Two weeks later, following a disagreement between plaintiff and Dr. Pattathan on how to read an x-ray (during which Ms. Borrello was present), Dr. Pattathan stated "[I don't] know why [I] bother with you people". Id., ¶72.[6] Likewise, on June 22, 2015, while plaintiff explained to Dr. Pattathan how to complete a form, he stated "that's your job . . . you people always want to argue". Id., ¶80. In response, plaintiff asked "You people as in women"?, and Dr. Pattathan walked away. Id., ¶81. Plaintiff also

---

[6]      Dr. Pattathan had also used the phrase "you people" in speaking to Ms. Borrello on June 18, 2015. He explained to DSA Tarbell that his use of that phrase in that instance was "not meant to be a derogatory remark . . . . It is in the context of 'both of the employees'" [21-4], p. 27 of 817 (CM/ECF).

attempted to correct Dr. Pattathan that day on how to conduct a tool inventory, and he responded by saying "no more talking", and walked away.  Id., ¶77.

As the dental hygienist, plaintiff was required to perform Ms. Borrello's dental assistant duties in her absence. Id., ¶74.  While acting as the dental assistant on June 23, 2015, plaintiff asked Dr. Pattathan to pick up cotton balls that he had dropped and stated that she drew the line at picking up things on the floor that someone else dropped. Id., ¶84; plaintiff's deposition transcript [27-3], p. 103.  Dr. Pattathan responded by stating "You can draw all the lines you want". Plaintiff's deposition transcript [27-3], p. 103.  Although plaintiff agreed that a dental assistant's duties including cleaning and/or discarding materials used by the dentist during treatment, she had never been required to pick things up from the floor that a dentist had dropped. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶85. That same day, Dr. Pattathan asked a female secretary, Annie Guziak, to assist him in locating a file, and when plaintiff interjected with the location of the file, Dr. Pattathan said "Who's talking to you? You will get me what I need". Id., ¶87.  While Dr. Pattathan's interactions with Ms. Guziak would sometimes end in arguments and yelling on his part (id., ¶239), plaintiff conceded that she did not observe problems with Dr. Pattathan interacting with other females.  Id., ¶237.

While continuing to act as the dental assistant on June 24, 2015, Dr. Pattathan told plaintiff "No lectures from you", when she told him that he needed to disinfect a dirty tool; and when she asked him if he had signed out a disposable syringe, he replied "You have to do that". Id., ¶¶90, 92; Complaint [1], ¶38.  The following day, plaintiff complained to DSA Tarbell about Dr. Pattathan, but did not make any allegations of discrimination.  Id., ¶¶94-95.

**July 2015**

On July 21, 2015, plaintiff changed a dental clinic call-out in S-Block to a
Wednesday, something that she had previously done without needing permission, but in response
to this change, Dr. Pattathan informed plaintiff (copying DSA Tarbell) to consult with him
before changing his normal schedule, which was to attend to S-Block on Mondays. Plaintiff's
Statement pursuant to Rule 56 [27-2], ¶¶99-101; [27-3], p. 690 of 783 (CM/ECF). Seemingly in
support of plaintiff, Dr. Hellert sent an e-mail later that day, stating that both Mondays and
Wednesdays were designated dental treatment days for S-Block. [27-3], p. 690 of 783
(CM/ECF).  That day, plaintiff again explained to Dr. Pattathan the need to complete certain
paperwork when signing out a syringe, and he again responded by stating "That's your job" and
"Do your job and be quiet". Id., ¶102. When plaintiff alerted Dr. Hellert to this incident, he sent
an e-mail to Dr. Pattathan, again appearing to agree that plaintiff's procedure was correct. Id.,
¶104; [27-3], p. 690 of 783.  DSA Tarbell described the situation to DSP Watkins as "out of
hand", explaining that the "Hygenist and Assistant are complaining about Dr. Pattathan and his
approach, but some of their e-mails are insubordinate".  [21-4], p. 35 of 817 (CM/ECF).

**August 2015**

On August 5, 2015, Dr. Pattathan was allegedly "barking orders" to plaintiff and
becoming upset because she was having difficulty lighting a Bunsen burner, which was delaying
his work. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶105. When plaintiff told Dr.
Pattathan that he should ask for things nicely, he replied "Be quiet".  Id.

On August 11, 2015, a meeting was called by the new DSA, Christine Parmeter,
who was also a Caucasian female, to discuss the expectations of staff in the dental clinic. Id.,

¶¶31, 35, 108-09.  During this meeting, which was also attended by Dr. Hellert, the need for

teamwork and professionalism was discussed. Id., ¶108-09; [27-3], p. 694 of 783 (CM/ECF).

### September 2015

On September 14, 2015, Dr. Pattathan met with plaintiff to discuss issues of

professionalism and provided her with a list of general rules of "Dental Office professionalism

during Patient Treatment". Plaintiff's Statement pursuant to Rule 56 [27-2], ¶117; [21-4], p. 53

of 817 (CM/ECF). Among the nine items of professional conduct that Dr. Pattathan included in

his e-mail were that he was "not expected to beg for auxiliaries to perform their assigned duties.

Simple 'Thank you' at the end of treatment should be sufficient", and that the "Dental Office

should be free of conflicts imagined or otherwise".  [21-4], p. 53 of 817 (CM/ECF).  He

concluded the e-mail with "Let us do our jobs to the best of our ability and go home in peace".

Id.  Thereafter, in a series of e-mails between Ms. Borrrello and plaintiff concerning these rules,

plaintiff wrote "Eff him", which she acknowledged meant "f### him". Plaintiff's Statement

pursuant to Rule 56 [27-2], ¶119; [27-3], 700 of 783 (CM/ECF).

On September 17, 2015, Dr. Pattathan imposed a new schedule, which required

plaintiff to treat more patients, and she complained to Dr. Helltert that it was in retaliation for her

complaints about Dr. Pattathan being unsafe and hostile.  Plaintiff's Statement pursuant to Rule

56 [27-2], ¶¶120, 122.  When plaintiff reported to work on September 22, 2015, she discovered

that Dr. Pattathan had left tools on the counter, failed to complete a tool inventory, and left

drawers unlocked.  Id., ¶124. Plaintiff believed that this was attributable to her race and gender

because Dr. Pattathan "expected that [she was] the one who should be taking care of them". Id.,

¶125. Two days later, she attempted to talk to Dr. Pattathan about not cleaning up his work area,

but it took her addressing him several times by name before he acknowledged her.  Complaint

[1], ¶55. During this encounter, she also attempted, at DSA Parmeter's direction, to communicate with him about whether any of the dental tool inventory could be eliminated, but he indicated that he "would talk to the Dep", and walked away as she was speaking. Id.

On September 24, 2015, Dr. Pattathan informed plaintiff that as the acting dental assistant, she was expected to perform those duties after she completed her dental hygienist duties. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶126. While plaintiff believed that her expected level of productivity increased, she acknowledged that her specific duties did not. Id., ¶142. Plaintiff believed that this request was discriminatory because he "expected to be waited on". DOCCS' Statement of Undisputed Facts [21-2], ¶127.

On September 30, 2015, plaintiff submitted a request for 15 minutes of overtime to Dr. Pattathan, which he transmitted to DSA Parameter, but she informed him that overtime required preapproval. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶129. Dr. Pattathan relayed this to plaintiff in an e-mail, in which he also suggested ways that she could better budget her time. Id., ¶130. Plaintiff then forwarded that e-mail to Ms. Borrello and stated "How do I budget how long it takes to wipe [Dr. Pattathan's] ass?" Id., ¶131; [21-4], p. 75 of 817 (CM/ECF). When plaintiff later attempted, at DSA Parmerter's suggestion, to talk to Dr. Pattathan concerning her duties, he stated that he would discuss it with DSA Parmerter, but when she persisted, he stated "I am communicating, I am the supervisor and I am telling you what to do", and walked away. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶134.

That same day, plaintiff received an electrical shock from a compressor, and when she brought it to Dr. Pattathan's attention, he checked the compressor and said that it was okay. Id., ¶136. However, when plaintiff brought it to the attention of maintenance, they confirmed that

the compressor needed repair. Id.  Plaintiff believed that Dr. Pattathan's actions were because of her race and gender.  Id., ¶137.

In September, Dr. Pattathan also improperly replaced a needle that resulted in her being stuck, but even after he imposed additional safety precautions, he later walked around the clinic with an uncapped needle, an event that Ms. Borrello brought to DSA Parmerter's attention. Id., ¶¶111-15. Plaintiff attributed the problems Dr. Pattathan had with needles to him having come from private practice (id., ¶252), but did not attribute this conduct to discrimination by Dr. Pattathan. Id., ¶111.

### October 2015

On October 5, 2015, plaintiff again complained to Dr. Hellert about Dr. Pattathan's lack of communication and feeling unsafe. Id., ¶138.  This was followed by a complaint to her union on October 9, 2015 regarding her safety concerns. Id., ¶¶143, 148.

Plaintiff's fiancé and cousin worked as correction officers at Lakeview and had the habit of coming to the dental clinic in the early morning.  Id., ¶¶206-07, 209. As early as July 15, 2015, Dr. Pattathan had complained about visitors to the dental clinic because of possible HIPPA violations, but it was not until October 14, 2015 that he banned social visitors to the dental clinic, which plaintiff believed was retaliatory.  Id., ¶¶146-47, 211.

On October 14, 2015, plaintiff also separately e-mailed DSA Parmerter complaining that Dr. Pattathan refused to communicate, and that she was "[o]nce again . . . notifying [her] of the hostile environment". [21-4], p. 409 of 817 (CM/ECF). In response, DSA Parmerter stated "I appreciate your continued effort on improving communication in the area.  It will continue to be impressed upon all staff to communicate effectively.  Dr. Pattathan is the supervisor of the area and his direction must be followed". [21-4], p. 407 of 817 (CM/ECF).

On October 16, 2015, Dr. Pattathan placed a file on plaintiff's desk and began to look around for something. When plaintiff asked him if he was looking for something, Dr. Pattathan replied "every time with you people". Plaintiff's Statement pursuant to Rule 56 [27-2], ¶154. Plaintiff again asked him whether "you people" meant "white females", and he walked away without responding. Id. Plaintiff never heard Dr. Pattathan verbalize any discriminatory animus except when he referred to her and Ms. Borrello as "you people". Id., ¶213.

On October 20, 2015, a patient got his pants snagged on the dental tray as he was leaving the dental chair. Plaintiff's deposition transcript [27-3], p. 180. Plaintiff commented to Dr. Pattathan that somebody was going to get hurt if he did not properly move everything out of the way. Id. Thereafter, Dr. Pattathan sent an e-mail to plaintiff entitled "Professional in the Dental Office" on which he copied DSA Parmerter and others. [21-4], p. 55 of 817 (CM/ECF). The e-mail stated that it was a "strict reminder" that she should "not interfere with [him] or his patients", that the "Dental Office is not the place to get into arguments whatever the issue maybe [*sic*]", and that "[a]ny further in Subordination [*sic*]" would be "subject to further action". Id.

Plaintiff sent another complaint concerning Dr. Pattathan to DSP Watkins on October 21, 2015, and she responded by stating that it would be forwarded to DOCCS' Office of Diversity Management. Id., ¶160; plaintiff's deposition transcript [27-3], p. 183. Plaintiff alleges that Watkins also sent a separate e-mail to DSA Parmerter, stating "your lovelies are in cahoots". Plaintiff's Statement pursuant to Rule 56 [27-2], ¶162. Although plaintiff was previously aware that she could file a complaint of discrimination with the DOCCS' Office of Diversity Management, she did not do so until October 26, 2015. Her complaint alleged gender discrimination and retaliation, which prompted an investigation that commenced on or about November 13, 2015. Id., ¶¶162-65; [21-4], pp. 62, 392-94 of 817 (CM/ECF).

In late October 2015, plaintiff indicated that she could not complete her duties without incurring overtime. In response, DSA Parmerter instructed her to speak to Dr. Pattathan about time management, and copied Dr. Pattathan on her e-mail. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶170. Dr. Pattathan responded by e-mailing plaintiff guidelines for completing her duties. Id., ¶171. When plaintiff later asked Dr. Pattathan if his e-mail was the discussion they were suppose to have, he relied "yes" and indicated that they would talk when a problem arose. Id., ¶172. As plaintiff persisted, he said "wait 'til a problem comes up again", and walked away. Id.

## November 2015

In advance of a November 6, 2015 staff meeting, Dr. Pattathan asked plaintiff and Ms. Borrello to write out their complaints. Id., ¶174. In response, Dr. Pattathan responded to each of the complaints as follows:

- The schedule: "I will ask the Dep.";

- Lack of communication: "I am the supervisor, I make the decisions"; and

- Inmates not following Shock rules: "The Superintendent said I can treat the patients (the dental clinic is a clinic not a jail) the way I want and you can treat them as you want". Id., ¶175; Complaint [1], ¶¶84-86.

Plaintiff believed that these responses were motivated by her gender and race because Dr. Pattathan was not treating her with the appropriate respect. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶176.

On November 6, 2015, Dr. Pattathan conducted a meeting with plaintiff and Ms. Borrello, and thereafter Dr. Pattathan sent an e-mail to Dr. Hellert seeking guidance on plaintiff's dental assistant duties, including plaintiff's belief that she could not perform dental assistant

duties more than 30% of the time under the union contract. Id., ¶¶177-78; [21-4], p. 46 of 817 (CM/ECF). In response, Dr. Hellert stated, "this is totally wrong . . . she can be asked/ordered to do more than 30% hygiene under emergency circumstances . . . . [T]his has already gone too far. Complaints of duties etc. . . . . If I have to I will outline her work day hour by hour and that will be it! So you have some time until I come to the facility.  If things are not ironed out when I come I will iron them out".  [21-4], p. 46 of 817 (CM/ECF).

On the same day as the staff meeting, plaintiff told Dr. Pattathan that "after a year he should know" the proper procedures, and in response Dr. Pattathan waived his hand, stated "Don't tell me what I should know", and walked away. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶179.  When asked if she believed that Dr. Pattathan's conduct was because of her race, plaintiff testified, "I don't know. He was angry". [27-3], p. 196.

On November 10, 2015, plaintiff suggested to Dr. Pattathan that he exchange a piece of broken equipment to which he replied "I am the dentist and I don't need you to make it easier. Stop harassing me". Plaintiff's Statement pursuant to Rule 56 [27-2], ¶180. Plaintiff believed that this was gender discrimination "[b]ecause I was going to fix equipment and he didn't want me to". Id.; [27-3], p. 198.  On November 23, 2015, following an incident with an autoclave, Dr. Pattathan asked plaintiff to write a report regarding her installation of that piece of equipment because "her actions may ruin the warranty". Plaintiff's Statement pursuant to Rule 56 [27-2], ¶¶181-82.  Plaintiff believed that this was retaliatory because she had never been asked to install something, but did not believe that it was based on gender or racial discrimination.  Id., ¶182.

Following up on his earlier warning, Dr. Hellert provided each member of the dental clinic with a scheduled list of duties at a November 24, 2015 meeting.  Id., ¶¶183-84. The

following day, Dr. Pattathan asked an officer about the whereabouts of a patient and plaintiff

interjected that Dr. Pattathan had been informed that the patient was not coming.  Minutes later

he yelled "You don't need to poke your nose into everything I say".  Id., ¶185.  Because Dr.

Pattathan asked the male officer about the whereabouts of the inmate, rather than her, she

believed that this was gender discrimination. Id., ¶186.

**December 2015**

On December 7, 2015, plaintiff asked Dr. Pattathan "what he needed" as he stood

behind her at the sink. Id., ¶189.   Dr. Pattathan responded "to wash my hands", to which

plaintiff replied "excuse me would be nice".  Id. Plaintiff believed that his actions were

motivated by her gender, since "he did not need to tell [her] - say excuse me, he just wanted [her]

to step aside". Id., ¶190.  That day plaintiff reported to Dr. Hellert and DSA Parmerter that Dr.

Pattathan did not have his keys on his person, which made her "feel unsafe". [21-4], p. 412 of

817 (CM/ECF).

DSA Parmerter held a December 21, 2015 meeting with the dental clinic staff,

which she memorialized in a subsequent memorandum, reminding them that they all needed to

follow the chain of command, communicate, and be respectful. [27-3], p. 733 of 783 (CM/ECF).

Plaintiff and Ms. Borrello were directed to submit daily written synopses to Dr. Pattathan, who

would add a brief summary. Id., p. 734 of 783.  Ms. Borrello transferred to Collins Correctional

Facility on December 26, 2015.  Borrello deposition transcript [27-3], pp. 291-92.  Thereafter,

plaintiff also requested a transfer.  Plaintiff's deposition transcript [27-3], p. 218.

**January 2016**

In plaintiff's January 8, 2016 synopsis, she stated that she walked in on Dr.

Pattathan "speaking ill" of her to other staff and "telling them that [she] said that [she] was

leaving Lakeview". [27-3], p. 739 of 783 (CM/ECF). In response, Dr. Pattathan denied

speaking ill of plaintiff, and then separately e-mailed DSA Parmerter that "[t]his whole thing is

not going anywhere . . . . My words are constantly twisted around and used as a complaint . . . .

My whole idea of a job is to come to work, do the work to the best of my ability and go home in

peace". [27-3], p. 738 of 783 (CM/ECF).

During a January 26, 2016 conversation with Dr. Hellert concerning the issues she

was having with Dr. Pattathan, plaintiff alleges that he stated "That's their culture". Id., ¶197.

### February 2016

On February 1, 2016, plaintiff asked Dr. Pattathan for a list of her duties in

writing, and when she did not receive a response, she alerted DSA Parmerter several days later.

Id., ¶199; [21-4], p. 415 of 817 (CM/ECF). When this was brought to Dr. Pattathan's attention,

he stated that he had verbally addressed this issue with plaintiff and would forward her an earlier

e-mail that he had sent her. Id. Plaintiff believed that Dr. Pattathan's reluctance to put her duties

in writing was because of her gender: "I don't think that he thought that I should be told again

when he was saying that I wasn't doing what I was suppose to be doing . . . I just think that he

thought that I should know". Plaintiff's Statement pursuant to Rule 56 [27-2], ¶200. She also

believed that his conduct was retaliatory. Id.

On February 8, 2016, plaintiff learned that she was being reassigned to Collins.

Plaintiff's deposition transcript [27-3], p. 218. That same day, Dr. Pattathan conducted a formal

counseling session with plaintiff, which was memorialized in a written memorandum for her

personnel file. [21-4], pp. 72 of 817 (CM/ECF). The counseling session was prompted by

plaintiff's comments to Dr. Pattathan in late January that he was "hideous" and on February 5,

2016 that he was "lazy". Id. After bringing the February 5, 2016 event to DSA Parmerter's

attention, she stated "Yes, you need to counsel her". Id., p. 50 of 817. Plaintiff denied referring to him as hideous, but acknowledged that she called him lazy. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶¶198, 204. Plaintiff believed that the counseling memorandum was in retaliation for her prior complaints regarding clinic safety. Id., ¶205. Following the counseling session, plaintiff did not return to Lakeview at the direction of her doctor, and transferred to Collins on February 11, 2016. Id., ¶7; plaintiff's deposition transcript [27-3], pp. 221-23.

During the relevant period, plaintiff had e-mail exchanges in which Ms. Borrello stated that Dr. Pattathan "is going to take over Lakeview ISIS", and that "[t]hey are all hideous", an apparent reference to Drs. Pattathan and Hellert. [30-1], pp. 4-5 of 14 (CM/ECF). In other e-mail exchanges between her and Ms. Borrello, Dr. Pattathan was referred to as "Hodgie-boy", that he went to dental school in "Hodgie-land", and had a "hodgie friend" at another correctional facility. Plaintiff's Statement pursuant to Rule 56 [27-2], ¶¶229-31. Additionally, plaintiff acknowledged that it was not good practice for a dental hygienist to criticize a dentist in front of a patient or to tell a dentist that he had done something wrong. Id., ¶¶241-42.

### The Charge and Complaint

On March 2, 2016, plaintiff filed a Charge with the New York State Division of Human Rights ("NYSDHR"), alleging discrimination and a hostile work environment based on race and gender, as well as retaliation. Id., ¶256.[7] The Complaint [1] alleges seven causes of action, all pursuant to Title VII: unlawful discrimination based on gender, race and national

---

[7]    "For a Title VII claim arising in New York to be timely, a plaintiff must file the charge . . . within 300 days of the allegedly unlawful employment practice." Baroor v. New York City Department of Education, 362 Fed. App'x 157, 159 (2d Cir. 2010) (Summary Order). Consequently, plaintiff acknowledges that her "look back" period extends to June 3, 2015. Complaint [1], ¶16. However, a hostile work environment claim can be treated as a continuing violation, permitting consideration of alleged acts of discrimination occurring prior to the 300-day limitations period. See Baroor, 362 Fed. Appx. at 159.

origin (First, Third, and Fifth Causes of Action), hostile work environment based on gender, race and national origin (Second, Fourth and Sixth Causes of Action), and retaliation. Seventh Cause of Action.[8]

## ANALYSIS

### A.    Summary Judgment Standard

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant.  Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

### B.    Discrimination Based on Gender and Race

"Title VII . . . prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." Ricci v. DeStefano, 557 U.S. 557, 577 (2009).  Such claims "may be proven under a disparate treatment . . . theory of liability" by demonstrating that "the defendant's actions were motivated by a discriminatory intent, either through direct evidence of

---

[8]    Recognizing that national origin discrimination was not alleged in the Charge, plaintiff withdrew her national origin claims.  Plaintiff's Memorandum of Law [27], p. 12.

intent or by utilizing the three-part burden-shifting framework set forth in <u>McDonnell Douglas</u> <u>Corp. v. Green</u>, 411 U.S. 792 (1973)." <u>Legg v. Ulster County</u>, 820 F.3d 67, 72 (2d Cir. 2016).

Under the burden-shifting framework, the plaintiff bears the burden of establishing a prima facie case of discrimination by showing that: "1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." <u>Mathirampuzha v. Potter</u>, 548 F.3d 70, 78 (2d Cir. 2008). "Once the plaintiff has met this de minimis burden, the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse action." If the defendant establishes such a reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination". <u>James v. New York Racing Association</u>, 233 F.3d 149, 154 (2d Cir. 2000). *See also* <u>McDonnell</u> <u>Douglas</u>, 411 U.S. at 804; <u>Fisher v. Vassar College</u>, 114 F.3d 1332, 1336 (2d Cir. 1997).

DOCCS moves for summary judgment on plaintiff's gender and race discrimination claims by arguing that she is unable to establish a *prima facie* case of discrimination.  Specifically, it contends that plaintiff did not suffer an adverse employment action, but that even if she did, the adverse employment action did not occur under circumstances giving rise to an inference of discriminatory intent. DOCCS' Memorandum of Law [21-1], pp. 6-8.

"An adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Fox v. Costco Wholesale Corp., 918 F.3d 65, 71–72 (2d Cir. 2019). "An employer's behavior does not constitute an adverse employment action because the employee sustained some generalized harm; the harm must be related to the employee's terms and conditions of employment." Sosa v. New York City Department of Education, 368 F. Supp. 3d 489, 496 (E.D.N.Y. 2019). With respect to whether plaintiff sustained an adverse employment action, DOCCS acknowledges, "one of the very few actions that the plaintiff could conceivably consider an adverse action is her own voluntary request to be reassigned to another correctional facility", but it argues that this was "done of her own volition and did not come with a decrease in salary". DOCCS' Memorandum of Law [21-1], p. 6. In response, plaintiff appears to argue that she was constructively forced to seek a transfer: Plaintiff "felt stressed and threatened to the point where she did not feel she could do her job and eventually applied for a transfer to another facility in order to escape from Dr. Pattathan". Plaintiff's Memorandum of Law [27], p. 9.

"Several district courts in this Circuit and several United States courts of appeals have applied the constructive discharge doctrine to situations where an employee voluntarily transfers to a different position with the same employer." United States v. New York City Department of Education, 2017 WL 435940, *7 (S.D.N.Y.), adopted, 2017 WL 1319695 (S.D.N.Y. 2017). To establish and adverse employment action based on a constructive involuntary transfer, plaintiff must establish that "(1) she was discriminated against to the point that working conditions were so intolerable that a reasonable person in her shoes would feel compelled to transfer; and (2) her transfer created a materially significant disadvantage in the terms and conditions of her employment." Id.,*8. See also Bianchi v. Rochester City School

District, 2019 WL 4750424, *8 (W.D.N.Y. 2019) (describing it as a "constructive demotion" theory).

However, even if plaintiff could meet the "demanding" standard of establishing that the working conditions were so intolerable that a reasonable person would feel compelled to transfer, Miller v. Praxair, Inc., 408 Fed. Appx. 408, 410 (2d Cir. 2010) (Summary Order),[9] she must still establish that the transfer resulted in a "materially significant disadvantage" in working conditions - i.e., "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation". Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004). Plaintiff conceded at her deposition that she continued in a full-time capacity as a dental hygienist with no decrease in pay at Collins. Plaintiff's deposition transcript [27-3], pp. 19-22. Although a "reduction in pay is not required for a transfer to be an adverse employment action", New York City Department of Education, 2017 WL 435940, *8, since plaintiff neither points to any evidence nor makes any arguments that the transfer resulted in a materially significant disadvantage, I conclude that plaintiff's voluntary transfer did not constitute an adverse employment action.

Likewise, the counseling memorandum issued by Dr. Pattathan fails to constitute an adverse employment action. It is well settled that "negative performance evaluations, formal reprimands, and counseling memoranda are not adverse employment actions for purposes of a disparate treatment claim unless accompanied by negative repercussions such as reduction in pay

---

[9]    See, e.g., Bianchi, 2019 WL 4750424, *8 ("because Bianchi has not made out a hostile work environment claim, he cannot satisfy the even more demanding standard for a constructive demotion claim").

or an injury to a plaintiff's ability to secure future employment". Babarinsa v. Kaleida Health, 58 F.Supp.3d 250, 260 (W.D.N.Y. 2014), aff'd, 622 Fed. Appx. 36 (2d Cir. 2015) (Summary Order). This holds true "[e]ven if the information in the counseling memoranda was false or misleading". Ziyan Shi v. New York Department of State, Division of Licensing Services, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019). The counseling memorandum issued here falls far short of the standard necessary to establish an adverse employment action, since plaintiff points to no repercussions, must less negative ones, arising from it and acknowledges that she committed some of the conduct (i.e., calling Dr. Pattathan lazy) upon which it was predicated.

Furthermore, as DOCCS argues, to the extent that Dr. Pattathan "was rude and yelled at and belittled her", it is "well settled that reprimands, closer monitoring, being yelled at, and unfair criticism do not amount to adverse actions". DOCCS' Memorandum of Law [21-1], p. 7. Lacking here is any evidence that Dr. Pattathan's conduct had a tangible effect on plaintiff's employment status. Even "[h]arsh reprimands do not rise to the level of an adverse employment action where there is no tangible effect on employment." Fox, 918 F.3d at 72. Likewise, "being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments do not rise to the level of adverse employment actions because they do not have a material impact on the terms and conditions of Plaintiff's employment." Smalls v. Allstate Insurance Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005). See also Chukwuka v. City of New York, 795 F.Supp.2d 256, 262 (S.D.N.Y. 2011), aff'd, 513 Fed. Appx. 34 (2d Cir. 2013) (Summary Order) ("reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation"); Davis v. NYS Department of Corrections Attica Correctional Facility P.O. Box 149 Attica, N.Y. 14001, 46 F. Supp. 3d 226, 236 (W.D.N.Y. 2014) ("[u]nfair criticism

and other unpleasant working conditions are not adverse employment actions"); Adams-Martin

v. Connecticut Department of Developmental Services, 2012 WL 878306, *9 (D. Conn. 2012)

("allegedly unfair or excessive monitoring, even when accompanied by verbal reprimands, is not

an adverse employment action without accompanying negative results"). "The conduct that

Plaintiff describes, despite the significant impact that she alleges it had on her physical and

mental health, does not rise to such a level as to constitute a 'materially adverse change in the

terms and conditions of Plaintiff's employment.'" Sosa, 368 F. Supp. 3d at 496 (quoting Galabya

v. New York City Board of Education, 202 F.3d 636, 640 (2d Cir. 2000)). Plaintiff has pointed to

no other adverse employment action. Therefore, I recommend that this claim be dismissed.[10]

### C.    Hostile Work Environment Based on Gender and Race

"To prove a hostile-work-environment claim, a plaintiff must show that the

complained-of conduct (1) is objectively severe or pervasive in that it creates an environment

that a reasonable person would find hostile or abusive; (2) creates an environment that the

plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment

because of the plaintiff's protected characteristic." Figueroa v. Johnson, 648 Fed. App'x 130, 134

(2d Cir. 2016) (Summary Order).  Although "[c]ourts in this Circuit have recognized that a

plaintiff's burden is 'remarkably high'" Epstein v. County of Suffolk, 2016 WL 4257349, *6

(E.D.N.Y. 2016), "[t]he environment need not be unendurable or intolerable". Terry v. Ashcroft,

336 F.3d 128, 148 (2d Cir. 2003).

---

[10]    Since I have concluded that there was no adverse employment action, it is unnecessary for me to address whether the adverse actions took place under circumstances giving rise to an inference of discrimination.

The Second Circuit has recognized that "hostile work environment claims present mixed question] of law and fact that are especially well-suited for jury determination", and that "summary judgment is appropriate only where application of the law to those undisputed facts reasonably support only one ultimate conclusion". <u>Schiano v. Quality Payroll Systems, Inc.</u>, 445 F.3d 597, 605 (2d Cir. 2006). Nevertheless, "[t]here are, of course, cases in which it is clear . . . that after assessing the frequency of the misbehavior measured in light of its seriousness, the facts cannot, as a matter of law, be the basis of a successful hostile work environment claim", since it remains "the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact and may be appropriate even in the fact-intensive context of discrimination cases". <u>Id</u>. at 608.

In order to survive a motion for summary judgment, "a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment". <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 69 (2d Cir. 2000). "There is no 'mathematically precise test' . . . for deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment." <u>Raspardo v. Carlone</u>, 770 F.3d 97, 114 (2d Cir. 2014) (*quoting* <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 22-23 (1993)). "Instead, courts must assess the totality of the circumstances, considering elements such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Id</u>. (*quoting* <u>Harris</u>, 510 U.S. at 23). *See also* <u>Mento v. Potter</u>, 2012 WL 1908920, *14 (W.D.N.Y. 2012) ("courts should not carve the work environment into a series of discrete incidents and then measure the

-22-

harm occurring in each episode"). The totality of the circumstances may include facially neutral

incidents, "so long as a reasonable fact-finder could conclude that they were, in fact, based on [a

protected characteristic]." Moll v. Telesector Resource Group, Inc., 760 F.3d 198, 203 (2d Cir.

2014). "But this requires some circumstantial or other basis for inferring that incidents . . .

neutral on their face were in fact discriminatory." Alfano v. Costello, 294 F.3d 365, 378 (2d Cir.

2002).

       In reviewing the totality of the evidence, I am "mindful that Title VII does not

establish a 'general civility code' for the American workplace". Petrosino v. Bell Atlantic, 385

F.3d 210, 223 (2d Cir. 2004) (*quoting* Oncale v. Sundowner Offshore Services, Inc., 523 U.S.

75, 81 (1998)). "Hostile work environment claims are meant to protect individuals from abuse

and trauma that is severe. They are not intended to promote or enforce civility, gentility or even

decency." White v. Fuji Photo Film USA, Inc., 434 F. Supp. 2d 144, 154-55 (S.D.N.Y. 2006);

Piccone v. Town of Webster, 2011 WL 3322550, *17 (W.D.N.Y. 2011), aff'd, 511 Fed. App'x

63 (2d Cir. 2013) ("it must be borne in mind that Title VII . . . [was] not intended to sterilize

employee relations or to create a generalized code of workplace civility"). *See also* Meritor

Savings Bank v. Vinson, 477 U.S. 57, 67 (1986) ("not all workplace conduct that may be

described as 'harassment' affects a 'term, condition, or privilege' of employment within the

meaning of Title VII"); Marcus v. Barilla America NY, Inc., 14 F. Supp. 3d 108, 114 (W.D.N.Y.

2014) (Title VII is not a "general civility code[ ] requiring supervisors to engage in unfailingly

decorous or diplomatic conduct, and they do not empower courts to act as super-personnel

departments, poised to question the reasonableness or fairness of every supervisor-employee

interaction").

DOCCS argues that plaintiff cannot establish that the conduct was severe or pervasive, or that the alleged harassment was due to her race or gender.  DOCCS' Memorandum of Law [21-1], pp. 12-14. As to whether the conduct was severe or pervasive, it contends that viewed collectively, plaintiff's claim "that a few times a month over the course of approximately 13 months, i.e. December 2014 - February 2016, Dr. Pattathan 'engaged in a regimen of accusations of [her] not being available, unsubstantiated fault finding and holding her accountable for things of which she [was] not part, accusations of failure to perform without rational basis to do so and creating an environment permeated with intimidation'", fails to "amount to severe or pervasive conduct sufficient to prove a hostile work environment claim". Id., pp. 12-13.  In response, plaintiff argues that she was "subjected to a range of hostile behaviors including Dr. Pattathan['s] violation [of] direct orders from his superiors, and his utter refusal to pay attention to her advice as a long serving member of the DOCCS dental program even though he had been ordered to do so".  Plaintiff's Memorandum of Law [27], p. 14. She further contends that Dr. Pattathan's "demeaning and degrading remarks were <u>continuous</u> and including yelling at her and calling her 'you people'" and "walking away from [her] when [she was] in mid-sentence and not allowing [her] to speak".  Plaintiff's Memorandum of Law [27], p. 14 (emphasis in original).

Viewing the totality of the alleged conduct relied upon by plaintiff, she has not presented evidence sufficient for a reasonable juror to conclude that the conduct rose to the requisite level of severity or pervasiveness.  The only objectionable conduct plaintiff identifies that is connected to her race or and gender is Dr. Pattathan's use of the phrase "you people". "Although clearly inappropriate, [these] statements - even if racially charged - in no way approach the bar set for this type of cause of action." <u>Pitts v. Howard University</u>, 111 F. Supp. 3d

9, 25 (D.D.C. 2015). *See also* <u>Bowden v. Clough</u>, 658 F. Supp. 2d 61, 81 (D.D.C. 2009) ("[w]hile being 'subjected to the phrase 'you people'' by a supervisor may be 'rude and insensitive,' '[such] comments and incidents do not describe a hostile environment under Title VII'").

In the context of the other alleged conduct relied upon by plaintiff, these comments demonstrate that Dr. Pattathan did not treat plaintiff well. However, it does not rise to the level necessary to maintain her claim. *See* <u>Liburd v. Bronx Lebanon Hospital Center</u>, 2009 WL 900739, *1, 8 (S.D.N.Y. 2009), <u>aff'd</u>, 372 Fed. Appx. 137 (2d Cir. 2010) (Summary Order) (concluding that referring to the plaintiff as "black ass" on several occasions, "in the context of [the supervisor's other alleged conduct, such as ignoring Plaintiff, monitoring her whereabouts, etc., the evidence merely shows that Esteves did not treat her well; it does not, however, rise to the level necessary to make out a hostile work environment claim").

Since Title VII is not intended as a general civility code, rude and boorish behavior, such as "persistent shouting and a display of poor temperament are insufficient to state a plausible hostile-environment claim". <u>Faison v. Leonard St., LLC</u>, 2009 WL 636724, *4 (S.D.N.Y. 2009). *See* <u>Tillman v. Luray's Travel</u>, 137 F. Supp. 3d 315, 335 (E.D.N.Y. 2015) (where the plaintiff, a bus driver, alleged, *inter alia*, that "the shop manager addressed him with a 'belligerent and hostile, vulgar' tone", "gave [him] looks indicating his dislike", and "provided with 'bad busses' that frequently experienced mechanical failures", the court concluded that even if the plaintiff "had adduced some evidence that his treatment was based on his race, his allegations are simply not objectively substantial enough to classify . . . as a hostile work environment", since "Title VII 'does not set forth a general civility code for the American workplace'"); <u>Marcus</u>, 14 F. Supp. 3d at 114 (allegations that the plaintiff's supervisor "was

critical of her performance, openly disagreed with her concerning certain work-related issues, 'yelled' at plaintiff and accused her of being 'the only one stopping the bus' and hindering the plant's progress when she identified safety or quality issues" did not plausibly allege conduct approaching a hostile work environment). Similarly, "being ignored by one's supervisor is simply not sufficiently severe to move beyond the mere tribulations of a workplace environment". Bailey v. International Paper, 2012 WL 405713, *3 (D.S.C. 2012).

Hence, the instances of Dr. Pattathan refusing to permit plaintiff to speak and walking away while plaintiff was mid-sentence, while certainly ill-mannered, are insufficient to create a hostile work environment. *See* Isbell v. City of New York, 316 F. Supp. 3d 571, 592 (S.D.N.Y. 2018) (concluding that allegations "of heavy scrutiny and criticism, discipline for inadequate work product, refusal to authorize overtime, use of a 'harsh and sarcastic tone,' refraining from communicating with Plaintiffs, denying Plaintiffs use of the DOC vehicle, and denying Plaintiffs training opportunities" did not state a claim for a hostile work environment); Liburd, 2009 WL 900739, *8.[11]

Even considering among the totality of the circumstances plaintiff's additional claims - *none of which she points to in responding to DOCCS' motion* - that Dr. Pattathan issued her an unfavorable schedule, required her to perform additional duties without incurring overtime, and made false allegations against her in the counseling memorandum, these too fail to establish a hostile work environment. *See* Clarke v. InterContinental Hotels Group, PLC, 2013 WL 2358596, *10 (S.D.N.Y. 2013) ("[p]laintiff has alleged that during the entirety of her time in the Sales & Marketing Department, her supervisors snubbed her; spoke to her rudely . . . and insulted her worth ethic; excessively scrutinized her work; and gave her more work to do than

---

[11]    I do not question whether plaintiff was subjectively affected by Dr. Pattathan's conduct.

other employees. Standing alone, these allegations do not plausibly point to a work environment that is sufficiently abusive to constitute a hostile workplace"); Trachtenberg v. Department of Education of City of New York, 937 F. Supp. 2d 460, 472–73 (S.D.N.Y. 2013) (the plaintiff's allegations that during the last two years of her employment as a teacher "she was subjected to excessive scrutiny; [her] principal . . . would 'frequently stand in the area and stare at [her] in an effort to intimidate her'; she received negative performance evaluations and letters from [her] principal that contained 'scurrilous charges'; she was moved to a poorly ventilated, windowless office; and she was refused training opportunities" were determined to "fall well short of the sort of conduct that courts have found sufficiently pervasive to alter the conditions of the victim's employment"); Nwanji v. City of New York, 2000 WL 1341448, *5 (S.D.N.Y. 2000) (even if there was evidence that the plaintiff's supervisors' conduct of "constantly reprimanding him and documenting his poor work performance" was motivated by discriminatory animus, this evidence was insufficient to establish a hostile work environment claim). [12]

Although hostile work claims are evaluated on a case-by-case basis and are "especially well-suited for jury determination", Schiano, 445 F.3d at 605, several Second Circuit opinions addressing similar alleged conduct provide useful guideposts in assessing the conduct at issue here. For example, in Davis-Molinia v. Port Authority of New York & New Jersey, 2011 WL 4000997, *11 (S.D.N.Y. 2011), aff'd, 488 Fed. App'x 530 (2d Cir. 2012), the Second Circuit affirmed the district court's grant of summary judgment dismissing the two co-plaintiffs'

---

[12]    Although further supportive of my conclusion, in giving plaintiff every favorable inference (as I must), I have ignored the evidence indicating that she had her own discriminatory animus toward Dr. Pattathan (plaintiff's Statement pursuant to Rule 56 [27-2], ¶¶230-31), that many of these incidents were triggered by plaintiff telling Dr. Pattathan that he did something wrong or criticizing him in front of a patient, conduct she acknowledged was generally not good practice for a dental hygienist (id., ¶¶241-42), that plaintiff did not observe problems with Dr. Pattathan's interactions with other women (id., ¶237), and that she experienced similar conflict with Dr. Sabuda. [21-4], pp. 23-24, 67 of 817 (CM/ECF).

hostile work environment claims, where over two months, one plaintiff's supervisor denied him time off and told "him to never ask for [it]  again", stated that he "would never see vacation again",  took away his job responsibilities and excluded him from important meetings", "yelled at him in front of staff to get out when he showed up at meetings", "made [him] stay until 4pm but not others", "harassed him more after he complained", and "had him brought up on disciplinary charges". 2011 WL 4000997, *11. Similarly, the other plaintiff's supervisors over the course of several years "excluded her from staff meetings that concerned her job functions and duties", "refused to greet her in the morning and would walk around the opposite way to his office to avoid her", "talked to her in [a] nasty way", "diminished her responsibilities and gave them to the clerks", "yell[ed] and talk[ed] down to her like she was an idiot when mistakes were made by others", "belittled her by telling her that her position was the same as a particular lower-ranked position", and "made it difficult for her to do her job" by failing to "intervene when a particular lower-ranked supervisor refused to give her documents she needed". Id.  Under these circumstances, the district court concluded that "[n]o reasonable juror could find that either Plaintiff was subjected to conduct that was sufficiently severe or pervasive, either in isolation or when viewed as a whole, to create a hostile work environment", explaining that "[t]he gravamen of their claims is rooted in conduct that amounts to nothing more than workplace dynamics". Id

Likewise, in Liburd, supra, the plaintiff's supervisor referred to the plaintiff as "black ass" on several occasions, "ignored and spoke to her harshly at meetings", "scolded her for not following the chain of command", "threatened transfer to another department", "gave her extra duties . . . [and] stripped her of certain duties, "closely monitored her", and "gave unrealistic time periods" to complete work. 2009 WL 900739, *1.  In affirming the District Court's determination, the Second Circuit found that this course of conduct was "not sufficient to

raise a genuine issue to be tried as to severity or pervasiveness notwithstanding the crude and contemptible character of what is alleged". Liburd, 372 Fed. App'x at 140.

Faced with similar allegations in Fleming v. MaxMara USA, Inc., 371 Fed. App'x 115, 119 (2d Cir. 2010) (Summary Order), that "defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her", the Second Circuit concluded that these incidents did support a finding of a hostile work environment that was pervasive or severe.

Even at the dismissal stage, the Second Circuit has found similar allegations to be insufficient to establish severe or pervasive conduct. For example, in Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015), the Second Circuit concluded that the following alleged conduct was not sufficient to be considered severe or pervasive:  the plaintiff's supervisor "made negative statements" about the plaintiff to others; "was impatient and used harsh tones" with him; "distanced herself from [the plaintiff] when she was nearby"; "declined to meet with [the plaintiff]"; "replaced [the plaintiff] at meetings"; "wrongfully reprimanded [the plaintiff]"; "increased [the plaintiff's] reporting schedule"; and made sarcastic comments. *See also* Harvin v. Manhattan & Bronx Surface Transit Operating Authority, 767 Fed. App'x 123, 128 (2d Cir. 2019) (Summary Order) ("[r]un-of-the-mill workplace conflicts, troubling though they may be, do not rise to the level of an objectively hostile workplace . . . . Harvin alleged that Moore and Amerson were rude and hostile on various occasions, but these incidents reflect only fraught relationships with her supervisors. Further, only two of the many incidents could have referred to Harvin's disability, which is insufficient to state a claim for hostile work environment").

-29-

Although not identical, the alleged conduct at issue here is comparable to (and not appreciably different) from what the plaintiffs in Davis-Molinia, Liburd, Fleming, and Littlejohn allegedly experienced.  Plaintiff makes no attempt to address, much less distinguish, the cases relied upon by DOCCS, including Littlejohn.  Nor does she cite any cases where comparable or less offensive conduct was sufficient to survive summary judgment.  Viewing the totality of the circumstances, the collective conduct plaintiff experienced and attributes to race and gender discrimination was not objectively sufficiently severe or pervasive to alter the conditions of plaintiff's working environment.[13]  Therefore, I recommend that this claim be dismissed.

## D.    Retaliation

Retaliation claims under Title VII are also analyzed pursuant to the McDonnell Douglas burden-shifting evidentiary framework. See Littlejohn, 795 F.3d at 315. "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she participated in a protected activity, suffered an adverse employment action, and that there was a causal connection between her engaging in the protected activity and the adverse employment action. This showing creates a presumption of retaliation, which the defendant may rebut by articulating a legitimate, non-retaliatory reason for the adverse employment action. If the defendant provides such an explanation, the presumption of retaliation dissipates, and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the

---

[13]    Based on this conclusion, it is unnecessary for me to address whether the alleged harassment was because of her gender or race (see Risco v. McHugh, 868 F. Supp. 2d 75, 117 (S.D.N.Y. 2012) ("[e]ven if Risco had offered some proof that Byrd's conduct was motivated by racial animus, she cannot establish the existence of a hostile environment")), or DOCCS' alternative argument that there is no basis for attributing the conduct to it, since it made complaint avenues available to its employees to complain of discrimination, which plaintiff was aware of, but failed to utilize until October 26, 2015. DOCCS' Memorandum of Law [21-1], pp. 19-20.

-30-

challenged employment action.'" <u>Ya-Chen Chen v. City University of New York</u>, 805 F.3d 59, 70 (2d Cir. 2015) (*quoting* <u>University of Texas Southwestern Medical Center v. Nassau</u>, 570 U.S. 338, 352 (2013)).

DOCCS challenges plaintiff's ability to establish a protected activity prior to October 26, 2015, and to meet the other elements of her *prima facie* showing. DOCCS' Memorandum of Law [21-1], pp. 16-18. It also argues that even if it could make such a showing, plaintiff is not entitled to monetary damages because it would have acted in same manner regardless of plaintiff's constitutionally protected activity. <u>Id.</u>, pp. 20-21.

### 1.    Protected Activity

"Protected activities include oppos[ing] an act or practice of discrimination based upon race, color, religion, sex, national origin, age or disability". <u>Herbert v. Delta Airlines</u>, 2014 WL 4923100, *4 (E.D.N.Y. 2014). Although "[g]eneralized complaints about the workplace do not qualify as a protected activity", anything that an "employer could reasonably have understood . . . was complaining about . . . discrimination" constitutes a protected activity. <u>Deuel v. Town of Southhampton</u>, 2015 WL 4394085, *8 (E.D.N.Y. 2015). "While . . . a plaintiff need not explicitly allege a violation of Title VII for . . . her conduct in making a complaint about working conditions to be considered protected activity . . . the plaintiff must complain of discrimination in sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, national origin, or any other characteristic protected by Title VII." <u>Brummell v. Webster Central School District</u>, 2009 WL 232789, *6 (W.D.N.Y. 2009).

DOCCS argues that "while the plaintiff did repeatedly complain about Dr. Pattathan's actions, the vast majority of said complaints were regarding Dr. Pattathan's alleged 'lack of safety', failure to follow DOCCS procedures and his negligent actions", and that it was "[n]ot until October 26, 2015" that she first complained about gender discrimination. DOCCS' Memorandum of Law [21-1], p. 17. *See* October 26, 2015 Diversity Management Complaint [27-3], pp. 707-09 of 783 (CM/ECF).   Therefore, it contends that all prior complaints should not be considered protected activities. Id.  In response, plaintiff alleges that she "specifically complained about his discriminatory behavior against Caucasian females".  Plaintiff's Memorandum of Law [27], p. 15.

The record demonstrates that DOCCS understood plaintiff's complaints to be asserting discrimination long before her October 26, 2015 Diversity Management Complaint. Although not cited by plaintiff, in a June 29, 2015 e-mail from DSP Watkins to DSA Tarbell, Dr. Hellert and others, she stated "there are some cultural issues here . . . . One of the things that I have to honestly say I am concerned by is the written statement made by Ms. Borrello, 'Many times I feel that he thinks I am his personal slave because of his simple request that he, himself can perform (ex. Retrieving charts that are 2 feet away from him while he is sitting at his desk' Now there are two ways to look at this.  I have a secretary who gets folders for me and I am within walking distance to the file cabinets, so I don't see anything wrong with that request . . . . The other side is maybe Dr. Pattathan is using a harsh tone, so the staff do not feel they have to respond.  I beg to differ.  But I do not condone staff being talked to harshly". [21-4], p. 67 of 817 (CM/ECF).

2.    **Adverse Action/Causal Connection**

Plaintiff does not identify any particular alleged adverse actions or causal links to her protected activity. Instead, relying on the alleged hostile work environment she experienced, plaintiff alleged in her Complaint ([1], ¶157) and argues in response to DOCCS' motion that "Dr. Pattathan engaged in an *ongoing* pattern of discriminatory practices against Plaintiff, including, without limitation, unwarranted criticism of h[er] job performance; interference with her ability to perform her duties, failure to properly assign work, assignment of the Plaintiff to lower jobs that were both outside of her job description". Plaintiff's Memorandum of Law [27], p. 16 (emphasis added). Therefore, I construe plaintiff's claim as asserting a retaliatory hostile work environment claim. *See* Joseph v. Brooklyn Developmental Disabilities Services Office, 2016 WL 6700831, *30 (E.D.N.Y. 2016) ("[g]iven that the discriminatory treatment on which Plaintiff bases his retaliation claim is the same conduct underlying his hostile work environment claim, the Court construes Plaintiff's claim as one for retaliatory hostile work environment").

"To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of [her] employment. . . . Further, to demonstrate causation between the protected activity and hostility, the plaintiff must establish some increase in the discrimination or harassment - either a ratcheting up of the preexisting behavior, or new, additional forms of harassment." Olsen v. Suffolk County, 2016 WL 5395846, *14 (E.D.N.Y. 2016). "If, however, the discrimination was just as bad before the employee complained as it was afterwards, then the employee's complaints cannot be said to have led to that discriminatory

behavior." <u>Bacchus v. New York City Department of Education</u>, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015).

Here, DOCCS argues that there can be no causal connection, since "[i]f Plaintiff is to be believed, there was no change in the way she was treated after she filed her complaints of discrimination". DOCCS' Memorandum of Law [21-1], p. 19. In response, plaintiff argues that "the *continuing* intimidation and insulting behavior *continued*" - not that it changed or intensified. Plaintiff's Memorandum of Law [27], p. 17 (emphasis added).

Plaintiff further argues that DOCCS failed to stop Dr. Pattathan "from continuing his insults and discriminatory practices". <u>Id</u>., p. 16.[14] In <u>Fincher v. Depository Trust and Clearing Corp.</u>, 604 F.3d 712, 721 (2d Cir. 2010), the Second Circuit held that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the *same* discrimination complaint", explaining that "[a]n employee whose complaint is not investigated cannot be said to have . . . suffered a punishment for bringing that same complaint: Her situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint or had the complaint been investigated but denied for good reason or for none at all" (emphasis added). However, the court noted that a failure to investigate may constitute an adverse employment action "if the failure is in retaliation for some *separate*, protected act by the plaintiff." <u>Id</u>. at 722 (emphasis added).[15]

---

[14]    In response to DOCCS' motion, plaintiff does not rely on any alleged independent acts of retaliation by DSA Tarbell or others.

[15]    By example, in <u>Fincher</u>, the Second Circuit cited to <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006), where an employer failed to investigate an employee's complaint of a death threat against him, in retaliation for an earlier complaint of discrimination filed by the same employee. Since the initial discrimination complaint resulted in a separate retaliatory failure to investigate the subsequent

Here, plaintiff does not allege that DOCCS "failed to investigate in response to a separate, protected act, but rather premises his claim on Defendants generally 'ignoring [his] complaints of discrimination'". Rogers v. Fashion Institute of Technology, 2016 WL 889590, *5 (S.D.N.Y. 2016). *See also* Williams v. Columbia University, 2012 WL 3879895, *4 (S.D.N.Y. 2012) ("even assuming that Williams did complain about new retaliatory acts, these complaints were not 'separate' from her earlier complaints because they related to a single alleged retaliatory scheme. Williams's claim that Columbia failed to investigate certain aspects of the scheme in retaliation for her earlier complaints about other aspects of the same scheme is barred by Fincher"); Strujan v. Teachers College Columbia University, 2010 WL 3466301, *10 (S.D.N.Y.), adopted, 2010 WL 3466251 (S.D.N.Y. 2010) ("[a]lthough the letters plaintiff wrote to Teachers College and Columbia's American Language program complaining of discrimination might be construed as protected conduct . . . the only activity plaintiff complains of subsequent to her writing those letters is defendants' failure to respond to those complaints and to subsequent complaints. This failure to respond does not constitute actionable retaliatory conduct because it would not deter a reasonable person from making a complaint of discrimination"); Hong Yin v. North Shore LIJ Health System, 20 F. Supp. 3d 359, 374 (E.D.N.Y. 2014) ("an employer's failure to investigate discrimination claims is not an adverse employment action"). Therefore, I recommend that this claim also be dismissed.

---

death threat, the D.C. Circuit concluded that the employee stated a claim for retaliation under Title VII. Id.

## CONCLUSION

For these reasons, I recommend that DOCCS' motion for summary judgment [21] be granted.  Unless otherwise ordered by District Judge Sinatra, any objections to this Report and Recommendation must be filed with the clerk of this court by March 25, 2020. Any requests for extension of this deadline must be made to District Judge Sinatra.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated:  March 11, 2020

JEREMIAH J. MCCARTHY
United States Magistrate Judge